IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| PAGEMELDING, INC., | No. C 11-06263 WHA |
| Plaintiff, | |
| v. | **CLAIM CONSTRUCTION ORDER** |
| ESPN, INC., | |
| Defendant. | |

**INTRODUCTION**

In this patent infringement action involving customized web content, the parties jointly seek construction of five phrases found in the asserted patent. Following the issuance of a tentative claim construction order (Dkt. No. 135), the parties were invited to file five-page critiques of the constructions therein. After consideration of the supplemental briefing, final constructions of the five phrases are set forth below.

**STATEMENT**

The invention described in United States Patent No. 6,442,577 allegedly dates to 1998. At the time, the modern internet was rapidly developing and expanding. The competition among content providers for website hits was surging, in particular due to the rise of internet advertising. The technology at issue in this action relates to methods of customizing web pages in order to attract website traffic.

At summary judgment, either side may select additional disputed claim terms for construction. The parties should keep in mind, however, that only one set of summary judgment

1  motions will be permitted, strictly limited to 25 pages. The parties will only get one bite at the
2  summary judgment apple.

3  This claim construction order follows a tentative claim construction order, oral argument,
4  and subsequent briefing by the parties. This order begins with an overview of the patent,
5  followed by an analysis of the five jointly-disputed claim terms.

**ANALYSIS**

**1.  CLAIM CONSTRUCTION LEGAL STANDARD.**

Claim construction is from the perspective of one of ordinary skill in the pertinent art at the time the patent was filed. *Chamberlain Group, Inc. v. Lear Corp.*, 516 F.3d 1331, 1335 (Fed. Cir. 2008). While claim terms "are generally given their ordinary and customary meaning," the "claims themselves provide substantial guidance as to the meaning of particular claim terms." As such, other claims of the patent can be "valuable sources of enlightenment as to the meaning of a claim term."

Critically, a patent's specification "is always highly relevant to the claim construction analysis." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312–15 (Fed. Cir. 2005) (en banc) (internal quotations omitted). Indeed, claims "must be read in view of the specification, of which they are a part." *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 979 (Fed. Cir. 1995) (en banc), *aff'd*, 517 U.S. 370 (1996). Finally, courts also should consider the patent's prosecution history, which "can often inform the meaning of the claim language by demonstrating how the inventor understood the invention and whether the inventor limited the invention in the course of prosecution, making the claim scope narrower than it would otherwise be." These components of the intrinsic record are the primary resources in properly construing claim terms. Although courts have discretion to consider extrinsic evidence, including dictionaries, scientific treatises, and testimony from experts and inventors, such evidence is "less significant than the intrinsic record in determining the legally operative meaning of claim language." *Phillips*, 415 F.3d at 1317–18 (internal quotations omitted).

While this order acknowledges that the parties have a right to the construction of all disputed and litigated claim terms by the time the jury instructions are settled, the Court will

2

reserve the authority, on its own motion, to modify the constructions in this order if further evidence — intrinsic or extrinsic — warrants such a modification. Given that claim construction is not a purely legal matter, but is (as the Supreme Court describes it) a "mongrel practice" with "evidentiary underpinnings," it is entirely appropriate for the Court to adjust its construction of claims prior to instructing the jury if the evidence compels an alternative construction, or if one side or the other advances a spin on the words that is unwarranted. *Markman*, 517 U.S. at 378, 390. The parties should be aware, however, that they are not invited to ask for reconsideration of the constructions herein. Motions for reconsideration may be made only in strict accordance with the rules of procedure, if at all.

### 3. THE '577 PATENT.

The '577 Patent, entitled "Method and Apparatus for Dynamically Forming Customized Web Pages for Web Sites," was filed on November 3, 1998, and issued on August 27, 2002. Front Porch, Inc. is the assignee, and plaintiff is Front Porch's successor-in-interest. The five claim terms for which the parties jointly seek constructions can be found throughout the 30 claims in the patent. Claim one is reproduced below with the relevant claim terms italicized (col. 9:47–61):

> 1. A method for dynamically *forming* customized web pages for a *first type network node* at a *second type network node*, comprising the steps of:
>
> *forming* at least a page *file* for the *first type network node*;
>
> *forming* at least a page *file* for the *second type network node*;
>
> receiving a service request from the *first type network node*;
>
> identifying the *first type network node* based on the service request; and
>
> *forming* a customized page *file* formed for the *first type network node* by including the page *file* formed for the *first type network node* within the page *file* for the *second type network node*.

The invention focused on the problem of attracting web users to websites, in particular as a means of generating advertising income. Internet service providers ("ISPs") connecting users to the internet generally had their own web portals with customized content for their subscribers. At the time of the invention, however, ISP portals' content was often low quality because the ISPs lacked the resources and know-how to build good web sites. As a result, ISP subscribers

tended to leave the ISP portal websites in favor of internet content providers' ("ICPs") web sites. ICPs also attracted traffic from organizations other than ISPs that provided users with access to the internet (col. 1:17–65).

The invention allegedly created a win-win situation for ICPs and organizations such as ISPs that provided internet access. The parties agree that the term "page file" in the patent refers to "a Web page file, such as an HTML file." Using the patented method, an ICP formed a page file for both itself and a page file customized for other network nodes. Upon receiving a service request from another network node — in other words, when the other network node's subscriber sought to access the ICP's website — the ICP identified the network node from which the request originated. The ICP would then form a customized web page for the user that included both its own page file, and the other network node's page file. In the internet advertising context, the ICP would create a customized page file for the user that included both its own page file, and advertisements from the other network node (col. 2:1–61).

The '577 Patent was previously litigated in *PageMelding, Inc. v. Feeva Technology, Inc., et al.*, No. 08-03484-CRB (N.D. Cal.). Two claim terms at issue in this action were construed in *Feeva*: first type network node and second type network node. Although not binding here, this order takes judicial notice of the *Feeva* claim construction order and the positions argued by the parties at that time.

### A.   "Network node"

The parties dispute the term "network node." Both provide constructions, but PageMelding argues that "network node" is a term of art that preferably should be given its ordinary meaning. The parties' proposed constructions are provided below:

| PAGEMELDING'S PROPOSED CONSTRUCTION | ESPN'S PROPOSED CONSTRUCTION |
|---|---|
| Plain and ordinary meaning; or, a combination of hardware and software capable of providing access to the internet. | A networked device having a unique IP address. |

4

1    This order concludes that network node should be construed as "internet connections for
2  an ICP, ISP, or organization."
3    ESPN argues that the claim terms themselves demonstrated that a network node must
4  have had a unique device IP address. ESPN fails to substantiate this contention. The only
5  evidence ESPN provides in support are extrinsic dictionary definitions referring to a single
6  "location" or a single "device." Although such extrinsic definitions are not irrelevant, they are
7  not a part of the claims.
8    ESPN's position is also contradicted by the specification. ESPN cites at length various
9  excerpts from the specification that referred to identification of a node by its IP address. ESPN
10 then argues that because all of its examples use an IP address, that patent must have only
11 contemplated identification of a network node by a *unique* IP address. This contention ignores
12 the fact that the patent discloses that network nodes could be identified by a range of IP
13 addresses (col. 6:28–31). ESPN also fails to address an important caveat in the specification:
14 "[t]he embodiment shown in FIG. 7 uses IP address [*sic*] to identify a participating network
15 node. However, it should be noted that DNS information can also be used" (col. 7:56–59). Put
16 differently, the patent discloses that network nodes could be identified by domain name. Plainly,
17 the "unique IP address" limitation ESPN seeks to add to the definition of "network node" is
18 contradicted by the specification itself. This disclosure also demonstrates that ESPN's
19 contention that if an ICP's network node did not have a unique IP address, a service request
20 recited in the claims could not be reliably addressed to it — is incorrect.
21   PageMelding argues that the plain and ordinary meaning of the term network node should
22 govern, but does not provide a clear basis for determining what that ordinary meaning was in
23 1998. Comparing the extrinsic evidence cited by ESPN with the various uses of "network node"
24 and "node" in the patent does not answer the question of what a network node was, nor whether
25 the patent's use of the term was consistent with any plain and ordinary meaning.
26   The patent stated that "[t]o the Internet, all ICPs, ISPs, and organizations that are
27 connected to it can be deemed as network nodes" (col. 3:54–55). Although not a complete
28 definition of the term, this phrase showed — by way of examples — that the patentee intended

5

the term network node to have a broad definition. This should be given great weight. "When a patentee explicitly defines a claim term in the patent specification, the patentee's definition controls." *Martek Biosciences Corp. v. Nutrinova, Inc.*, 579 F.3d 1363, 1380 (Fed. Cir. 2009).

In its claim construction critique, ESPN contends that the tentative construction "internet connections for an ICP, ISP, or organization" mistakenly pluralizes the term "node" to refer to multiple different internet connection points, rather than a single connection point. This argument lacks merit. As is clear from the broad, though incomplete definition of network node in the specification, "all ICPs and ISPs" connected to the internet are network nodes. Thus, a network node is not *necessarily* limited to a single internet connection point. This broad definition also invalidates PageMelding's observation that the term only exists as a part of other terms for construction ("first type network node" and "second type network node"), and therefore does not require construction.

ESPN argues that PageMelding's alternative construction is so broad as to read the limitation out of the claim. This contention misses wide of the mark because ESPN reaches this result by assuming its conclusion. Specifically, ESPN argues that a network node must have had a unique IP address because "for the patent to work, each node must be a uniquely addressable device on the network." This is both logical error and, as noted above, contradicted by the specification.

ESPN also tries to substantiate this argument by importing the word "any" into PageMelding's proposed construction "a combination of hardware and software capable of providing access to the internet." ESPN then asserts that construing the term to mean "any combination of hardware" means the term could have comprised multiple ISPs, or any combination of network nodes. This *reductio ad absurdum* argument relies on complete acceptance of the word "any," which is not a part of the construction. Neither party would be permitted to argue this implausibly expansive interpretation of the claim term to a jury. The word "combination," however, still creates ambiguity in the scope of the phrase.

PageMelding's proposed alternative construction is also problematic for a separate reason. According to the patent, all ICPs, ISPs, and organizations that were connected to the

6

internet were network nodes. It is clear, however, that not all internet connection points were "capable of providing access" to the internet.

This order holds that the definition provided by specification itself is preferable to the parties' proposed constructions. Taking account of the parties' positions at oral argument, however, the exact language of the specification does not provide a clear boundary on what constitutes an ICP, ISP, or organization connected to the internet. The term network node cannot be extended, for example, to a complete corporate entity that is also fairly described as an ICP. Thus, this order construes the term "network node" as follows: "internet connections for an ICP, ISP, or organization."

**B.  "First type network node" and "second type network node"**

The parties dispute the terms "first type network node" and "second type network node." Because all of ESPN's arguments in this context depend on its construction of "network node," the two terms can be addressed simultaneously:

**"first type network node"**

| PAGEMELDING'S PROPOSED CONSTRUCTION | ESPN'S PROPOSED CONSTRUCTION |
|---|---|
| An Internet Service Provider (ISP) or organization from which a service request is received. | An ISP or organization network node. |

**"second type network node"**

| PAGEMELDING'S PROPOSED CONSTRUCTION | ESPN'S PROPOSED CONSTRUCTION |
|---|---|
| An Internet Content Provider (ICP). | An ICP network node. |

This order adopts PageMelding's proposed constructions.

Both of these terms were previously construed in *Feeva*. PageMelding asserts that those exact constructions should be preserved *in toto*. ESPN objects but only in a limited regard. ESPN concedes that the *Feeva* constructions are correct insofar as "first type" refers to an ISP or organization and "second type" refers to an ICP. ESPN contends that the issue for resolution here is the application of the limitation "network node," into which ESPN incorporates the limitation of a unique IP address. This issue was not addressed in *Feeva*.

7

For the reasons explained above, ESPN's construction of "network node" is flawed. The flaw remains apparent when "network node" is used in the context of a "first" (ISP) or "second" (ICP) type. The patent specification explained that a second type ICP node such as Yahoo could form a partnership with a first type ISP node such as AT&T (col. 9:25–30). Consistent with the construction of network node adopted above, both types of network node could be described as "a combination of hardware and software capable of accessing the internet." Neither Yahoo nor AT&T, however, could be considered "a networked device having a unique IP address."

ESPN's only objection to the constructions of "first type" and "second type" network node from *Feeva* involve its own proposed construction of "network node." Leaving that aside, the parties are otherwise in agreement that the *Feeva* constructions are acceptable (or, at least, ESPN has failed to lodge any further objections). There are now two ostensibly acceptable constructions for each of these terms. The question thus becomes whether to use ESPN's proposed construction, but incorporating the construction of network node adopted herein, or to preserve the construction from *Feeva*.

The parties' briefing does not address this question, and it was not addressed at oral argument. ESPN's critique does address the issue, but only in the context of the its incorrect interpretation of "network node." Notably, ESPN's critique does not the *Feeva* claim construction order. As before, the undersigned agrees with Judge Breyer's well-reasoned opinions on the construction of these terms.

Focusing more specifically on the differences on the two constructions, ESPN's original request (properly construed) results in the phrase "network node" appearing in both the term and its definition. This has a greater potential to confuse a jury than the more straightforward *Feeva* constructions. ESPN's suggestion in its critique that the construction of network node should be incorporated into these two terms renders their constructions wordy and awkward; it does not improve the result.

Therefore, this order construes "first type network node" as "an Internet Service Provider (ISP) or organization from which a service request is received," and "second type network node" as "an Internet Content Provider (ICP)."

8

### C.   "File"

The parties' proposed constructions for "file" are shown below:

| PAGEMELDING'S PROPOSED CONSTRUCTION | ESPN'S PROPOSED CONSTRUCTION |
|---|---|
| Plain and ordinary meaning; or, an element for storing information. | A collection of data stored by name. |

This order holds that the plain and ordinary meaning of "file" should govern, as understood by one having ordinary skill in the art in 1998. Tentatively: "a collection of information capable of being stored."

Words in a claim "are generally given their ordinary meaning." *Phillips*, 415 F.3d at 312. The next step is "to determine whether the inventor has used [the term] in a manner inconsistent with [its] ordinary meaning." *Ibid.* The patent specification does not define "file." Viewed as a whole, the specification and claims clearly treat the word as fundamental to the art and a prerequisite for understanding specific kinds of computer files implicated by the patent. There is no express indication that the inventor assigned the term any special meaning.

ESPN contends, however, that there are several instances where the specification referred to a file as being "stored." On this basis, and on the basis of extrinsic definitions, ESPN concludes that the concept of a file in the patent must be limited to a collection of data that was "stored by name." ESPN rehashes these same arguments in its critique. PageMelding replies that a file could or could not be stored, but there is no reason to conclude that it must have been stored. PageMelding does not object to the tentative construction, but requests in the alternative that the Court decline to construe the term file because it only appears as part of the term "page file" in the claims.

ESPN's argument for limiting the scope of the term file is unpersuasive. ESPN is attempting to read a limitation from the written description into the claims, one of the "cardinal sins" of claim construction. *Phillips*, 415 F.3d at 1320. ESPN cites examples from the specification where ISP and ICP page files were stored, but does not cite any examples where the dynamically-formed, customized page file produced using the patented method was stored,

9

1  or stored by name. Thus, it is not reasonable to infer that the cited examples of files being stored
2  entail that a file would always have been stored.

3  For the same reason, this order declines to depart from the plain and ordinary meaning of
4  the term "file" in favor of PageMelding's proposed alternative construction. Nor is there a
5  reason in the specification or claims to limit the contents of a file to "data," as opposed to the
6  broader concept of information suggested in the extrinsic sources cited by ESPN.

7  This order retains the tentative construction and holds that the plain and ordinary
8  meaning of a file as understood by a POSA in 1998 was "a collection of information capable of
9  being stored."

**D.     "Forming"**

The parties' proposed constructions of "forming" are shown below:

| PAGEMELDING'S PROPOSED CONSTRUCTION | ESPN'S PROPOSED CONSTRUCTION |
|---|---|
| Plain and ordinary meaning; or, accessing and organizing data into at least one page file. | Completing assembly of. |

This order adopts the plain and ordinary meaning of "forming" as it would have been understood in the context of these claims by a POSA in 1998: "giving form to, making, or assembling."

"Forming" is a commonplace, non-technical word. ESPN's construction of this term includes the concept of "completing," which is not a part of the basic English definition (including the dictionary definition cited by ESPN itself), and therefore immediately suspect. In the context of claim one, ESPN explains that its construction "completing assembly of" can replace the term "forming" without unduly warping the overall claim. This is not *ipso facto* an argument for adopting an unusual definition of a common word. Although the substitution works without doing obvious violence to the invention, it is clear that "completing assembly" is a more limited conception of "forming" than mere "assembly." ESPN fails to explain why the

1  common definition of "forming" should be altered in the first place. Put differently, ESPN does
2  not explain why the inventor actually meant "completing assembly of" instead of a broader
3  concept of "forming" that also includes "completing assembly."

4  ESPN asserts that "there is no disclosure where 'forming' is described as only partial
5  assembly of a page file." This is incorrect. The patent disclosed a file database where the
6  elements in the database that were formed into page files could be "provided by ISPs and
7  organizations, or designed by an ICP" (col. 6:32–47). Consistent with ESPN's construction, it
8  would have been possible to create such a file database using only files where assembly had been
9  completed by the ICP practicing the patented method. However, it would also have been
10 possible, for example, to create a database that mixed HTML files created by the ICP with
11 graphics files created by an ISP. Strictly speaking, when the ICP formed the page file for the
12 ISP, it would not have "completed assembly of" the file. ESPN's construction is therefore too
13 narrow.

14 PageMelding fails to explain why its proposed alternative construction would be better
15 than the plain meaning of the term. ESPN also correctly observes that PageMelding's ten-word
16 alternative construction of the common word "forming" could be confusing for a jury.

17 In its critique, ESPN requests that the final construction remove the words "making" and
18 "assembling" from the definition. This would make the construction of forming "giving form
19 to." This definition runs the risk of confusing the jury by virtue of being too short and redundant
20 to be meaningful.

21 This order therefore retains the following plain and ordinary meaning construction of the
22 word "forming" as it would have been understood in the context of these claims by a POSA in
23 1998: "giving form to, making, or assembling."

**CONCLUSION**

25 The constructions set forth above will apply in this action. The Court reserves the
26 authority, on its own motion, to modify these constructions if further evidence warrants such a
27 modification (but counsel may not move to reconsider them). The Court thanks counsel for their
28

11

efforts in illuminating the meaning of the foregoing terms.

**IT IS SO ORDERED.**

Dated: March 5, 2013.

WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE